UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,                            Case No. 14-cr-20780
                                                  Hon. Matthew F. Leitman
v.

CURTIS SCOTT,

      Defendant.
_____/

**ORDER (1) DENYING DEFENDANT'S MOTION FOR A NEW TRIAL (ECF ## 144, 162) AND (2) DENYING DEFENDANT'S VARIOUS MISCELLANEOUS REQUESTS FOR RELIEF**

On March 9, 2016, a jury found Defendant Curtis Scott guilty of aiding and abetting a carjacking, aiding and abetting the use and/or carrying of a firearm during a crime of violence, and making a false statement to a federal agent. Scott has now filed a motion for new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. (*See* ECF ## 144, 162.) For the reasons explained below, the motion is **DENIED**.

**I**

The government's theory at trial was that Scott induced two impressionable teenage boys, Roland Hubbard and Dexavior Evans, to carjack a vehicle for him. The government contended that Scott drove Hubbard and Evans to scene of the carjacking and then led them away from the scene once they had stolen the vehicle.

The government argued that Scott wanted the vehicle in question (a 2006 Mercury Grand Marquis) because (1) Scott's own vehicle (a 1996 Mercury Grand Marquis) was in poor shape and (2) Scott intended to replace parts on his vehicle with parts from the carjacked vehicle. The government also asserted that after the carjacking, Scott lied to federal agents about whether he had a cellular telephone that belonged to Hubbard. The government's evidence included testimony from Evans directly implicating Scott in the carjacking, a video recording of the carjacked vehicle and a vehicle matching the description of a vehicle owned by Scott entering the freeway shortly after the carjacking, audio recordings of telephone conversations in which Scott made incriminating statements, and evidence that around the time of the carjacking, Scott's cellular telephone was communicating with Hubbard's phone and was in the vicinity of the carjacking.

Scott, who did not testify, presented an alibi defense to the charges. Three witnesses testified in support of that defense: Monico Hayes, Desmond Brooks, and Paijah McCloud. They told the jury that on the evening of the carjacking, Scott watched a movie with them during "family movie night" and then went to sleep. Scott's defense also included a vigorous cross-examination of Evans, the government's most important witness. The jury ultimately convicted Scott of the charges described above.

Following the trial, Scott expressed dissatisfaction with his appointed trial counsel, Leroy Soles. He asked the Court to terminate Soles' representation and to appoint substitute counsel to assist with post-trial matters, including sentencing. The Court granted that request and appointed attorney Patricia Maceroni to handle these remaining post-trial matters and to represent Scott on appeal.

On February 17, 2017, Ms. Maceroni filed a motion for a new trial on Mr. Scott's behalf. (*See* ECF #144.) In that motion, Ms. Maceroni primarily argued that Mr. Scott was deprived of the effective assistance of counsel when Mr. Soles suggested that one of Mr. Scott's alibi witnesses, Paijah McCloud, could potentially have been involved in the carjacking. Ms. Maceroni also argued that Mr. Soles failed to investigate other important matters related to Scott's defense. Finally, she contended that Scott was entitled to a new trial based on newly-discovered evidence – statements from two individuals who claimed that Evans had recanted his trial testimony implicating Scott in the carjacking.

Mr. Scott then sent the Court a letter complaining about Ms. Maceroni's representation. The Court conducted a status conference on March 9, 2017, to inquire into Mr. Scott's complaints. Mr. Scott told the Court that Ms. Maceroni had refused to raise in the new trial motion a number of issues that Scott had asked her to raise. (*See* March 9, 2017 Status Conf. Tr. at 30-31, 35, ECF #202 at Pg. ID 3129-

30, 3134.)  Scott was adamant that any motion for a new trial should fully present his issues. (*See id.*)

During this same status conference, Ms. Maceroni explained to the Court that she had considered all of the issues that Scott wished to raise, and had determined, in her professional judgment, that the issues  Scott identified lacked merit and should not be raised. (*See id.* at 5-8, Pg. ID 3104-07.)  Ms. Maceroni further opined that a conflict had arisen between herself and Mr. Scott and that, as a result, she could not continue to represent him.  The Court thus permitted Ms. Maceroni to withdraw as counsel.

The Court then offered to appoint yet another attorney for Scott. (*See id.* at 34-35, Pg. ID 3133-34.)  Scott declined that offer because he did not want to wait for a new attorney to get up to speed on the case and because he was concerned that a new attorney might decline to present the issues he wished to raise. (*See id.* at 35-36, Pg. ID 3134-35.)  Scott instead indicated that he wanted to represent himself. (*See id.*)    The Court advised Mr. Scott not to represent himself, informed Scott of the dangers of self-representation, and conducted a colloquy with Scott that closely tracked the waiver of counsel colloquy set forth in the Benchbook for the U.S. District Court Judges (4th ed.). (*See id.* at 38-43, Pg. ID 3137-42.) Scott then waived his right to counsel and began representing himself.  (*See id.* at 43, Pg. ID 3142.)

The Court agreed to permit Mr. Scott to file a supplemental motion for new trial raising the additional issues that he wished to present to the Court. He did so on March 22, 2017. (*See* ECF #162.)

The government initially opposed Mr. Scott's request for a new trial on the ground that Scott failed to file his motion within fourteen days of his conviction, as Rule 33(b)(2) of the Federal Rules of Criminal Procedure requires. (*See* ECF ## 148, 167.) However, the government later asked the Court "to accept Scott's untimely" filings. (ECF #169.) The government then responded on the merits to the arguments presented by Ms. Maceroni and by Scott in his supplemental motion. (*See* ECF #171.)

The Court next reviewed the parties' submissions and determined that it needed to develop a factual record in order to resolve some (but not all) of the issues raised by Ms. Maceroni and Scott. (*See* ECF #180.) The Court set the matter for an evidentiary hearing. (*See id.*) The Court later identified eight issues on which it would receive testimony and evidence at an evidentiary hearing:

> 1. The assertions in the affidavits of Monico Hayes and Paijah McCloud (ECF ## 144-1 and 144-2) that Hayes and McCloud informed Soles that they could present certain exculpatory testimony and that Soles unreasonably failed to elicit that testimony from them during their direct examination. The hearing will address whether Hayes and McCloud so informed Soles and, if they did so inform Soles, why Soles chose not to elicit the testimony.

2.      The assertion in Scott's affidavit (ECF #144-3) that Soles failed to investigate and present evidence that Tynisha Jones had damaged a 2005 Grand Marquis leased by her mother. The hearing will address whether Soles was told about this alleged evidence and, if he was, whether Soles investigated it and why he chose not to present it at trial.

3.      The assertion in Scott's affidavit (ECF #144-3) that Soles failed to investigate and present evidence that Dexavior Evans had threatened Scott in phone calls that Evans made to Scott. The hearing will address whether Soles was told about this alleged evidence and, if he was, whether Soles investigated it and why he chose not to present it at trial.

4.      Scott's assertion that Soles promised Scott that Soles would not impugn McCloud's credibility or attack McCloud if Scott permitted Soles to remain as counsel. (See ECF #162 at Pg. ID 2753.) The hearing will address whether Soles made this alleged promise and, if he did, why he chose to suggest in his closing argument that McCloud may have been present at the time of the carjacking.

[. . .]

[5.]    Attorney Soles' failure to obtain tape recordings of a 911 call allegedly placed by Scott's cellular telephone;

[6.]    Soles' failure to call Demetrius McCloud as an alibi witness at Scott's trial;

[7.]    Soles' failure to investigate whether Tynisha Jones' brother's "baby mama" possessed a Ford Expedition that could have been driven by Dexavior Evans during the carjacking; and

[8.] Soles' failure to investigate allegedly threatening behavior by Tynisha Jones against Scott at the "Scotch" party store/market.

(Order, ECF #196 at Pg. ID 3086-88.)

The evidentiary hearing lasted two days. It commenced on November 7, 2017, and concluded on March 12, 2018. At the commencement of the hearing, the Court identified one additional issue on which it would receive evidence: Scott's claim that Soles failed to discover and present evidence that parts from the carjacked 2006 Grand Marquis were not interchangeable with parts from Scott's 1996 Grand Marquis.

Four witnesses testified at the evidentiary hearing: Scott, Soles, Roy McCallister (an investigator on Scott's defense team), and Kurt Limburg (a service manager for a Lincoln-Mercury dealership). The Court finds that the testimony of Soles and McCallister was entirely credible, and the Court relies on much of that testimony in its analysis below. Soles and McCallister each presented with a believable demeanor, and they appeared candid and forthright in their testimony. To the extent that there were any conflicts in the testimony by Scott, on one hand, and the testimony of Soles and McCallister, on the other hand, the Court credits the testimony of Soles and McCallister.

At the conclusion of the hearing, the Court allowed Scott and the government to file post-hearing briefs. Both Scott and the government filed supplemental briefs

(*see* ECF ## 355, 368), and Scott filed several replies to the government's supplemental brief. (*See* ECF ## 374, 375, 377, 378.)

## II

Scott seeks relief under Rule 33 of the Federal Rule of Criminal Procedure.[1] In relevant part, that rule provides: "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. Proc. 33(a). "A motion for a new trial can be premised on the argument that the verdict was against the manifest weight of the evidence, and it can be premised on the argument that substantial legal error has occurred." *United States v. Callahan*, 801 F.3d 606, 616 (6th Cir. 2015) (internal quotations omitted). "Although the Rule does not define 'interest of justice,' a violation of a defendant's Sixth Amendment right to the effective assistance of trial counsel constitutes a substantial legal error such that a new trial is warranted." *United States v. Arny*, 831 F.3d 725, 730–31 (6th Cir. 2016) (internal quotations omitted).

---

[1] Scott's supplemental motion (ECF #162) is somewhat difficult to follow, and it was a challenge for the Court to determine precisely which issues Mr. Scott is raising. The Court has made its best effort to discern and address both the claims that Scott has raised and the claims raised by Ms. Maceroni (which the Court readily understood).

## III

Soles and his defense team (which included investigator McCallister, the former head of the Detroit Police Department homicide unit) spent 1,935 hours working on Scott's defense. (*See* Nov. 7, 2017 Evid. Hearing Tr. at 191-93, ECF #261 at Pg. ID 3618-20.)  Their hard work was obvious throughout the course of the proceedings.  Indeed, they presented a vigorous defense on Scott's behalf.  They filed pre-trial motions to suppress certain evidence; successfully opposed the admission of unfairly prejudicial prior bad acts evidence that the government sought to introduce at trial; vigorously and effectively cross-examined Evans, the government's key witness, and then argued extensively that Evans should not be believed; attacked the government's contention that Scott had a motive to commit a carjacking; criticized the government's assertion that Evans and Hubbard, the actual carjackers, were troubled teens; and explained to the jury why it should believe that the alibi witnesses could remember events from two years earlier.  Nonetheless, Scott contends that Soles and his team failed to provide effective assistance of counsel.

Scott's ineffective assistance claims are governed under the familiar standard established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984).  In *Strickland*, the United States Supreme Court set forth a two-part test for evaluating claims of ineffective assistance of counsel.  First, a defendant must show that his

counsel's performance was deficient. *Strickland*, 466 U.S. at 687. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* Second, the defendant must show "that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.*

To satisfy the performance prong of *Strickland*, a defendant "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. A court's scrutiny of counsel's performance is highly deferential. *See id.* at 689. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. The burden is on the defendant to overcome the presumption that the challenged action was sound trial strategy. *See id.* at 689.

To satisfy the prejudice prong of *Strickland*, a defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "This does not require a showing that counsel's actions 'more likely than not altered the outcome,'" but "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011) (quoting *Strickland*, 466 U.S. at 693).

## A

The Court begins with the claims that Scott raised in his supplemental motion – *i.e.*, the claims that Ms. Maceroni refused to present because she believed they lacked merit.

## 1

Scott first argues that Soles was ineffective for failing to seek dismissal of the Superseding Indictment on the ground that the Superseding Indictment "was unreliable and false." (ECF #162 at Pg. ID 2744.) However, Soles could not have moved to dismiss the Superseding Indictment based upon the evidence underlying that indictment because "courts evaluating motions to dismiss do not evaluate the evidence upon which the indictment is based." *U.S. v. Landham*, 251 F.3d 1072, 1080 (6th Cir. 2001); *see also U.S. v. Short*, 671 F.2d 178, 182 (6th Cir. 1982) (stating that the "validity of an indictment is not affected by the type of evidence presented to the grand jury, even though that evidence may be incompetent, inadequate, or hearsay"). Soles "cannot be deemed ineffective for failing to make a futile motion" attacking the Superseding Indictment. *Farr v. Davis*, 2012 WL 707033, at *16 (E.D. Mich. Mar. 5, 2012) (citing *U.S. v. Steverson*, 230 F.3d 221, 225 (6th Cir. 2000)).

**2**

Scott next contends that Soles was ineffective for failing to object to certain aspects of the government's closing argument. First, Scott complains that Soles did not object to the government's statement in its closing that Scott's car was in bad shape – a claim the government made to support its theory that Scott had a motive to carjack a similar car to use as a source of replacement parts. (*See* ECF #162 at Pg. ID 2748.) But Soles did not ignore the government's contention concerning the description of Scott's car. Instead, he specifically attacked that assertion in his closing argument. (*See* Jury Trial Tr. at 79-80, ECF #124 at Pg. ID 1855-56.) Soles' decision to address the government's claim concerning the condition of Scott's car through argument in his own closing rather than through an objection to the government's closing was not unreasonable. *See, e.g., Searcy v Berghuis,* 549 Fed. App'x 357, 362 (6th Cir. 2013) (holding that counsel was not ineffective for withholding objection to prosecutor's closing argument where counsel responded to objectionable portion of prosecutor's closing in his own closing). Moreover, Scott has not shown that he suffered prejudice from Soles' decision to attack the government's claim in his own closing rather than by objecting during the government's closing.

Second, Scott complains that Soles failed to object to the government's statement in its closing that Evans never denied his involvement in the carjacking.

(*See* ECF #162 at Pg. ID 2748.) But Soles specifically highlighted in his closing argument that Evans *did* previously suggest that he may not have been involved in the carjacking. (*See* Jury Trial Tr. at 95, ECF #124 at Pg. ID 1871.) Soles' decision to address the government's statement in its closing in his closing rather than through an objection to the government's closing was not unreasonable. *See Searcy*, 549 Fed. App'x at 362. And Scott has not shown that he suffered prejudice from Soles' decision to confront the government's contention during his closing rather than by objecting during the government's closing.

Third, Scott complains that Soles failed to object to the government's statement in its closing that Evans consistently admitted his criminal history. (*See* ECF #162 at Pg. ID 2748.) But Soles noted during his closing argument that Evans had attempted to deny and/or minimize culpability for some of his criminal history. (*See* Jury Trial Tr. at 93, ECF #124 at Pg. ID 1869.) Soles' decision to address the government's claim in its closing in his own closing rather than through an objection to the government's closing was not unreasonable. *See Searcy*, 549 Fed. App'x at 362. And, again Scott has not shown that he suffered prejudice from Soles' decision to attack the government's assertion during his closing instead of objecting to the government's closing.

Fourth, Scott argues that Soles was ineffective for failing to object to the government's statement in its closing that Scott admitted his involvement in the

carjacking during one of the recorded telephone conversations. (*See* ECF #162 at Pg. ID 2748.)  But there was no basis for an objection.  The government was permissibly arguing its interpretation of the recorded evidence that was played for the jury, and that interpretation was not unreasonable.  The government's description of Scott's statements was well within proper bounds. *See U.S. v. Henry*, 545 F.3d 367 (6th Cir. 2008) (noting that the Sixth Circuit "afford[s] wide latitude to a prosecutor during closing argument").  Soles was not ineffective for failing to make an objection to the government's characterization of the recording that would have been overruled.

Fifth, Scott contends that Soles should have objected when the government said in its closing that after the carjacking the "Grand Marquis [the stolen car] while on the entrance ramp [was] closely following behind the blue Expedition [Scott's vehicle]." (ECF #162 at Pg. ID 2748.)  Scott says that the Grand Marquis was never behind the Expedition.  Soles was not ineffective for failing to object to this statement because the statement was not particularly important.  The jury had seen a video recording of the vehicles entering the highway, and thus it was well aware of the actual order of the vehicles.  It was not unreasonable for Soles to withhold an objection on this minor point, and even if the failure to object could be deemed unreasonable, Scott has not shown that the lack of an objection on this issue caused him prejudice.

Sixth, Scott complains that Soles failed to object when, during closing argument, the government commented on the refusal of the defense alibi witnesses to speak to law enforcement in the months between the Superseding Indictment and trial. Some background is helpful in understanding this aspect of Scott's claim. During cross-examination of the defense alibi witnesses, the government elicited that even though those witnesses claimed to have exculpatory alibi information, they made no effort to provide that information to law enforcement and declined to speak with agents when contacted. Then, during closing argument, the government contended that the witnesses should not be believed because they waited until trial to tell their stories and avoided telling their stories to the investigators. (*See* Jury Trial Tr. at 67, ECF #124 at Pg. ID 1843.) Scott now argues that the government improperly commented on the witnesses' invocation of their Fifth Amendment right to remain silent and that Soles should have objected to the government's improper commentary.

But Scott has not persuaded the Court that Soles could have made a meritorious objection to the government's comments. Scott has not cited any authority for the proposition that Scott would have had standing to complain about an aspect of the government's closing that supposedly infringed *the witnesses'* Fifth Amendment rights (not Scott's). More importantly, Scott has not cited any authority to support his argument that the government's comments were an improper attack

on the witnesses' credibility or that the comments violated the Fifth Amendment in any way.  It was certainly fair for the government to impugn the credibility of the alibi witnesses by highlighting that they did not come forward sooner with their supposedly-exculpatory information.  Scott has not demonstrated that Soles was ineffective for failing to object to the government's attack on the alibi witnesses.

Finally, Scott alleges that Soles failed to make a number of other objections to the government's closing, but the matters Scott identifies were not particularly important.  Thus, Soles reasonably could have chosen to withhold objection, and Scott has not shown that Soles' failure to object on these collateral issues caused prejudice.

**3**

Scott argues that Soles was ineffective for failing to move to suppress certain cellular telephone records that the government obtained from Metro PCS. (ECF #162 at Pg. ID 2751, 2760.)  Metro PCS provided the records in question to state law enforcement officers in response to a January 9, 2014, order issued by the 48th District Court for the State of Michigan. (*See* Order, ECF #21-4.)  That court issued its order pursuant to the Stored Communications Act, 18 U.S.C. § 2703(d).  The records related to Scott's cellular telephone and revealed, among other things, the location of cellular towers with which the phone connected over a period of many months.

Scott contends that Soles should have moved to suppress (and/or objected to the admission of) the records on the ground that they were not obtained through a search warrant.[2] (*See* ECF #162 at Pg. ID 2751, 2760, 2763.)  Scott insists that the government needed a warrant to obtain the records because the records revealed his location over an extended period of time.  He says that the records "would have been suppressed due to the long term GPS tracking" and that the government could not have secured admission of the records through the "good faith exception." (*Id.* at Pg. ID 2751.)

But the United States Court of Appeals for the Sixth Circuit recently reached the *opposite* conclusion. *See United States v. Pembrook*, 876 F.3d 812, 822-24 (6th

---

[2] Soles actually did move to suppress the Metro PCS records obtained pursuant to the January 9, 2014, state-court order (and other records) earlier in the case (*see* ECF #16), but the request to suppress those particular records was mooted when the government indicated that it would not seek to introduce them against Scott. (*See* Notice, ECF #31.)  All of this occurred when the parties were proceeding under the original Indictment which contained only a single count of making a false statement to a government agent.  The government later filed a Superseding Indictment that added the carjacking charge. (*See* Superseding Indictment, ECF #45.)  At that point, Soles renewed the motion to suppress (*see* ECF #61), and the Court denied it. (*See* ECF #62.)  At the time Soles filed his renewed motion, the government still did not intend to introduce against Scott the records it obtained under the January 9, 2014, state-court order.  Accordingly, neither Soles' renewed motion to suppress nor the Court's ruling denying that motion addressed the admissibility of those records.  However, the government later decided that it would seek to introduce at least some of the Metro PCS records that were obtained under the January 9, 2014, state-court order.  Scott's current complaint is that Soles was ineffective for failing to reassert his objection to admission of those records once the government decided to introduce them.

Cir. 2017). That court held that the good faith exception *did* apply and that suppression was *not* an appropriate remedy where (during 2014) officers obtained cell tower location information via a Stored Communications Act order rather than through a search warrant. *See id.* The Sixth Circuit explained:

> The district court denied the defendants' motion to suppress and held that, even if mistaken, the government had "an objectively reasonable good-faith belief" that no warrant was required. [*U.S. v.*] *Pembrook*, 119 F.Supp.3d [577,] 595–96 [(E.D. Mich. 2015)]. "[N]o Supreme Court authority established by mid–2014 that obtaining cell-site data—even data that might reveal [the defendants'] daily travel over a six-week period or disclose [their] presence in a private place—was a search within the meaning of the Fourth Amendment," *id.* at 591; nor did any Sixth Circuit case establish such precedent, *id.* at 592–93; nor was the out-of-Circuit precedent compelling (or consistent), *id.* at 593-95. The district court concluded that, *"[a]lthough it may ultimately become settled [law] that long-term tracking via cell phones ... requires a warrant supported by probable cause, that law was not established at the time the Government sought and obtained the cell-site data at issue in this case. Deterrence, therefore, will not be forwarded by suppression." Id. at 599. We agree and find no constitutional reason to suppress the cell-tower location evidence.*

*Id.* at 823 (emphasis added).

As *Pembrook* makes clear, even if law enforcement officers violated the Fourth Amendment by obtaining the Metro PCS records without a warrant,[3] the

---

[3] The Court's analysis above assumes that the Fourth Amendment's warrant requirement applies to the records in question. But that is not clear today – and was even less clear at the time of trial in this case. The weight of authority at the time of

records were nonetheless not subject to suppression.  Thus, Scott has not shown that he suffered prejudice as a result of Soles' failure to move to exclude the records.

## 4

Scott next asserts that Soles failed to investigate, and make use of, certain comments by a judge in the state court criminal prosecution of Hubbard for the carjacking.[4]  According to Scott, at Hubbard's state court preliminary examination on the carjacking charge, a state district judge made certain observations about what he believed was depicted on a video recording of certain events on the night of the carjacking.  Scott insists that the state judge's comments were helpful to his defense in this case, and Scott says that Soles erred by not discovering and seeking to admit the comments here. (*See* ECF #162 at Pg. ID 2752-53, 2755.)  But Scott has failed to show that the state judge's opinion of what the video depicted would have been admissible at his trial.  Thus, Scott is not entitled to relief based upon Soles' failure to have the state judge's comments admitted at this trial.

---

trial held that a cell phone subscriber lacked an expectation of privacy in historical cell phone records like those from Metro PCS that the government used against Scott in this case. *See, e.g., United States v. Davis*, 785 F.3d 498, 511-12 (11th Cir. 2015); *In re Application of the United States for Historical Cell Site Data*, 724 F.3d 600, 611-15 (5th Cir. 2013).  And after trial, the Sixth Circuit held that the Fourth Amendment is not implicated when the government obtains historical cellular telephone billing and call detail records. *See United States v. Carpenter*, 819 F.3d 880, 890 (6th Cir. 2016), *cert. granted*, 137 S. Ct. 2211 (2017).

[4] Unlike Scott, Hubbard was prosecuted in state court for the carjacking.

**5**

Scott further maintains that Soles failed to notify the Court about "unauthorized communications" between a juror and the lead FBI case agent. (ECF #162 at Pg. ID 2742.)  Scott says that he personally raised this issue with the Court on March 9, 2016. (*See id.*)  The March 9, 2016, transcript reveals that Scott informed the Court that he and Soles saw that "one of the jurors was smiling" at the agent. (Jury Trial Tr. at 133, ECF #124 at Pg. ID 1909.)  Soles was not ineffective for failing to seek some unspecified relief based upon an alleged "smile."  And Scott has not presented the Court with any reason to believe that there is any possibility that any government agent improperly communicated with members of the jury during the trial.  Thus, Scott is not entitled to relief on his claim that Soles unreasonably failed to challenge improper communication between the government and the jury.

**6**

Scott complains that Soles (1) failed to object under *Batson v Kentucky*, 476 U.S. 79 (1986), when the government improperly used a peremptory challenge against an African-American juror (juror #5) and (2) failed to inform the Court that one of the government prosecutors said "my racism is showing" once jury selection was complete. (ECF #162 at Pg. ID 2763.)  But Soles *did* raise a *Batson* challenge to the government's exercise of the peremptory challenge (*see* Voir Dire Tr. 180-

186, ECF #131 at Pg. ID 2120-26), and the Court overruled the objection. Thus, there is no basis for Scott's claim that Soles was ineffective for failing to make such a challenge. Moreover, as Scott acknowledges, he personally told the Court about the prosecutor's "my racism is showing" statement. (ECF #162 at Pg. ID 2754.) Thus, even if Soles did not raise the issue, Scott has not shown prejudice from that failure because the Court was aware of the issue. Finally (and in any event), the Court is certain that the prosecutor's comment (1) was a sarcastic response to what the prosecutor regarded as an unfounded allegation of discrimination and (2) was not an acknowledgment by the prosecutor that she, in fact, harbored racist views or exercised a peremptory challenge against an African-American juror based upon the juror's race.[5] The prosecutor's statement does not in any way undermine the Court's confidence in its decision to overrule Soles' *Batson* objection. This is a further reason that Scott has not shown prejudice from Soles' failure to inform the Court about the prosecutor's sarcastic comment.

**7**

Scott next argues that Soles failed to inform the Court that the government allegedly attempted to intimidate two of Scott's witnesses – Erica Jones and Paijah McCloud – into declining to testify on Scott's behalf. But both of those witnesses did testify on Scott's behalf, and Scott has not shown that they limited their

---

[5] The Court does not believe that the prosecutor in fact harbors racist views.

testimony in any way due to the alleged threats by the government. Nor has he shown that the alleged threats impacted his defense in any material way. Thus, Scott has not shown that he was prejudiced by Soles' failure to inform the Court about the purported witness intimidation by the government.

## 8

Scott contends that Soles was ineffective for failing to obtain recordings of 911 calls allegedly placed from Scott's cellular telephone on the day of the carjacking. Scott argues that the recordings would support his position that he did not have his phone and was not present at the scene of the carjacking.

But Scott has not shown that Soles and the defense team could have obtained these recordings. The carjacking occurred on November 12, 2013. Soles was not appointed to represent Scott until more than one year later. (*See* ECF #6.) McCallister testified that he informed Soles that, based upon his extensive law enforcement background, the 911 recordings would not be available so long after the calls were made. (*See* Mar. 12, 2018 Evid. Hearing Tr. at 89, ECF #344 at Pg. ID 4097.) Scott has not presented any evidence that the recordings were still in existence at the time Soles was appointed as counsel. On this record, Scott has failed to show that Soles unreasonably failed to obtain the recordings or that he (Scott) suffered prejudice related to Soles' alleged failure to obtain the recordings.

Scott argues that Soles was ineffective for failing to call Demetrius McCloud as an additional alibi witness.  The Court disagrees.

Demetrius McCloud was a teenager who was supposedly present with Scott for some portion of family movie night at the time of the carjacking.  Soles was aware of Demetrious McCloud but chose not to call him for several reasons.  First, Soles thought he had enough alibi witnesses and did not feel that a fourth materially added to the defense. (*See* Nov. 7, 2017 Evid. Hearing Tr. at 185, ECF #261 at Pg. ID 3612.)  Second, Demetrius McCloud could not account for Scott's whereabouts following the end of the movie; the only person who could account for Scott at that time – Monico Hayes – was already on the defense witness list. (*See id.* at 185-86, Pg. ID 3612-13.)  Third, Scott did not ask Soles to call Demetrius McCloud as an alibi witness. (*See id.* at 186, Pg. ID 3613.)  Finally, Soles was "concerned about too many young people testifying on Scott's behalf because it fit with [the government's] theory that [Scott] was this manipulative person" with respect to young people. (*Id.* at 220-21, Pg. ID 3647-48.)

Soles' reasons for not calling Demetrius McCloud are reasonable strategic justifications.  Thus, Soles did not render deficient performance by omitting Demetrius McCloud from the defense witness lineup.

Finally, Scott has not demonstrated prejudice as a result of the omission of testimony from Demetrius McCloud. Scott has not presented an affidavit from Demetrius McCloud, and he has made no showing as to what testimony Demetrius McCloud actually could have offered. On this record, Scott has not shown that the failure to call Demetrius McCloud prejudiced him.

**10**

Scott next contends that Soles missed an opportunity to present evidence that may have suggested that Evans committed the carjacking without any involvement by Scott. This evidence was connected to a woman named Tynisha Jones who was known to both Scott and Evans. Jones testified as a witness for the government at trial.

Scott complains that Soles failed to present evidence that Jones' brother's "baby mama" had a Ford Expedition. (ECF #355 at Pg. ID 4210.) Scott says that he could have used this evidence to suggest that Evans had access to, and was driving, the Expedition during the carjacking. Scott argues that this evidence would have undermined the government's claim that he was driving the Expedition during the carjacking. Scott also insists that this evidence could have supported his theory that Evans carried out the carjacking at Jones' behest. The Court rejects the claim related to the "baby mama" of Jones' brother for two reasons.

First, the Court credits and accepts Soles' testimony that Scott never mentioned this issue. (*See* Nov. 7, 2017 Evid. Hearing Tr. at 187, ECF #261 at Pg. ID 3614.) Soles did not act unreasonably in failing to investigate and present evidence about which Scott never informed him and about which he had no reason to know.

Second, Scott has not shown that the absence of this evidence caused him prejudice. The evidence is, at best, tangential, and any connection between Evans and the "baby mama's" car is purely speculative.

## 11

Finally, Scott argues that Soles was ineffective for failing to investigate allegedly-threatening behavior that Jones directed toward Scott at a party store while Scott was free on bond in this case. Scott says that the evidence could have been used to undermine the credibility of testimony that Jones offered as a government witness at trial. Scott is not entitled to relief on this claim.

During Scott's testimony at the evidentiary hearing, he explained that this claim is based in large part upon the failure of Soles and McCallister to obtain a video recording of the interaction from the party store at which it occurred. (*See id.* at 66-67, ID 3493-94.) But Scott admitted that the video likely did not capture the audio of the exchange (*see id.* at 67, Pg. ID 3494), and thus there is no basis on which

to conclude that the video would have lent material support to Scott's defense. Soles did not act unreasonably in failing to secure the video under these circumstances.

Moreover, Scott has failed to show that the absence of the video recording caused him prejudice. As noted above, Scott has not shown that the video recording contained audio of the conversation, and without audio, the recording would not have meaningfully corroborated Scott's claim that Jones threatened him. Furthermore, as Scott conceded at the evidentiary hearing, Soles "extensively" cross-examined Jones concerning her bias against Scott and her motive to testify falsely against him. (*Id*. at 92-93, Pg. ID 3519-20.) For instance, Soles induced Jones to concede that (1) her prior romantic relationship with Scott ended when Scott became involved with another woman and (2) Scott did not help her with her baby but Evans did. (*See id*. at 93-95, Pg. ID 3520-22.) Simply put, Soles effectively showed the jury that Jones may have harbored bias against Scott and that she may have had a motive to lie, and the video recording of the encounter between Scott and Jones at the party store would not have added much to that showing. Thus, Scott has failed to demonstrate that he suffered prejudice from the absence of the recording.

**B**

The Court now turns to the ineffective assistance claims raised by Ms. Maceroni on behalf of Scott. (For ease of reference, the Court will still refer to these as "Scott's claims" and "Scott's arguments.")

**1**

Scott argues that Soles was ineffective because during Soles' closing argument, he "[d]iscredit[ed] the credibility of Paijah McCloud, Mr. Scott's alibi witness." (ECF #144 at Pg. ID 2468.) The Court disagrees.

**a**

Some background is needed in order to understand Scott's claim related to Soles' treatment of McCloud during his closing. As the trial approached, Soles and Scott clashed on the issue of whether the defense should call McCloud as a witness. Scott wanted to call her to support his alibi defense by presenting testimony that she was with him at "family movie night" on the night of the carjacking. Soles strongly objected. He was concerned that calling McCloud would open the door to the admission into evidence of a recording containing damaging statements to the defense. (*See* Nov. 7, 2017 Hearing Tr. at 207-09, ECF #261 at Pg. ID 3634-36.) He was also concerned that calling McCloud – a teenager – and having her testify about time spent with Scott would lend support to the government's theory that Scott manipulated children. (*See id.* at 205, Pg. ID 3632.) Soles was also concerned that

the relationship between McCloud and Scott would appear "strange" to the jury and could raise concerns in the jury's mind about whether Scott was having an inappropriate sexual relationship with McCloud. (*See id.* at 206, Pg. ID 3633.)

The dispute between Soles and Scott related to McCloud came to a head on March 7, 2016, as the defense was presenting its case. During an *in camera* proceeding, Scott and Soles told the Court about their disagreement. (*See* Jury Trial Tr. at 140, ECF #132 at Pg. ID 2277.) As the discussion proceeded, Soles said that he refused to call McCloud, and the Court then informed Scott that he had two choices – (1) continue to retain Soles as counsel and without McCloud as a witness or (2) represent himself with McCloud as a witness. Scott said that he would stick with Soles even though Soles would not call McCloud.

Scott apparently continued to press Soles on the McCloud issue, and Soles reluctantly relented. Soles called McCloud as the final defense witness on March 8, 2016. On direct examination, she testified that she picked Scott up at roughly 6:50 p.m. on the evening of the carjacking (which actually occurred at roughly 5:00 a.m. the following morning); that she drove Scott to family movie night at her mother's house; that the family members watched a movie; and that she then left the room in which the movie had been playing and went to bed "kind of late" – at a time she cannot remember. (Jury Trial Tr. at 63-65, ECF #123 at Pg. ID 1615-17.)

The government's cross-examination of McCloud then went much as Soles feared it would. The government elicited that Scott lived at her residence; that they also worked together; and that McCloud had spoken to law enforcement officers at least two times during their investigation of the carjacking but that she had never before mentioned family movie night. The government also asked McCloud about damaging statements she had made on a recorded telephone call with Hubbard. In a series of answers that came across as lacking credibility, McCloud denied recalling and/or attempted to minimize the significance of her statements during the call. (*See id.* at 76-78, Pg. ID at 1628-30.)

As Soles prepared for his closing argument, he was wrestling with what he perceived to be one of the key challenges in his closing: trying to place Mr. Scott's cell phone – which, as noted above, was in the vicinity of the carjacking at the time of the carjacking and was communicating with Hubbard's phone at that time – in the hands of someone other than Scott. (*See* Nov. 7, 2017 Evid. Hearing Tr. at 115-17, ECF #261 at Pg. ID 3542-44.) Soles regarded this as a daunting challenge because "there was no evidence that anybody took [Scott's] phone" and because "the only person who could have said that [Scott's phone had been stolen] was [Scott who] didn't testify." (*Id.* at 117, Pg. ID 3544.)

The night before Soles' closing argument, he decided that he would suggest to the jury that three people could have had Scott's phone at the time in question:

Hubbard, Evans, or McCloud.  Soles decided to include McCloud on this list even though suggesting that she could have had the phone at the time of the carjacking (1) was inconsistent with her alibi testimony and (2) suggested a possible link between her and the carjacking.

Soles made a strategic decision that the benefits of expanding the list of possible phone possessors to include McCloud outweighed the risks of doing so in several respects.  First, he thought that he had little to lose by distancing Scott from McCloud's alibi testimony because he believed that jury did not see her as "trustworthy" and did not have "a lot of esteem for" her. (*Id.* at 211, Pg. ID 3638; *see also id.* at 213, Pg. ID 3640.)  Simply put, Soles "thought her testimony had been damaged, that she was not believable." (*Id.*)   Second, Soles did not think that McCloud's testimony, even if accepted by the jury, added much to Scott's claimed alibi because McCloud "went to bed" before the carjacking occurred and thus could not account for Scott's whereabouts at that critical time. (*Id.* at 185, Pg. ID 3612.) Third, Soles thought it was plausible to suggest that McCloud may have had Scott's phone and been working in conjunction with Evans at the time of the carjacking because there was evidence that McCloud had previously spent the night with Evans and kissed him. (*See id.* at 212, Pg. ID 3639.)  In short, Soles decided to implicate McCloud because he "need[ed] to put [Scott's] phone in somebody else's hand," and he thought it was worth the risk. (*Id.*)

After reaching that decision, Soles placed a telephone call to Scott and told Scott that he was going to include McCloud on the list of possible phone possessors. (*See id.* at 119-23, Pg. ID 3546-50.) While Scott had previously objected to Soles' suggestion that the defense suggest that McCloud may have played a role in the crime, Scott did not object during that call. (*See id.* at 120-21, Pg. ID 3547-48.) Instead, he asked Soles why Soles was going to suggest a link between McCloud and the Scott's phone, and Soles explained his reasoning. (*See id.*) Based upon this interaction with Scott the night before the closing, Soles concluded that any statements "pointing the finger at Ms. McCloud during [his] closing [would not be] in contravention of direction or requests made to [him] by Mr. Scott." (*Id.*)[6]

---

[6] The above account of the conversation between Soles and Scott from the evening before closing arguments comes from Soles' testimony. Scott disputes Soles' account of their conversation and says that he consistently opposed any suggestion by Soles that McCloud's credibility should be impugned. The Court credits and believes Soles' account of their conversation as described in text above. In addition, the Court rejects Scott's suggestion that testimony by McCallister undermines Soles' account of the conversation. (*See* ECF #355 at Pg. ID 4219.) During the testimony in question, Scott asked McCallister to confirm he (Scott) had taken the position that McCloud should not be impugned if she testified, and McCallister did so. (*See* March 12, 2018 Evid. Hearing Tr. at 88, ECF #344 at Pg. ID 4096.) But that testimony by McCallister simply verified the undisputed point that at certain points during Soles' representation of Scott, Scott had opposed the suggestion that McCloud be impugned. McCallister's testimony says nothing about whether, during the call between Soles and Scott the night before the closing, Scott objected when Soles said that he intended to suggest that McCloud may have had Scott's phone at the time of the carjacking. Indeed, there is no evidence that McCallister participated in, or was aware of, that final phone call. McCallister's testimony thus does not undermine Soles' claim that Scott did not object during that call.

During Soles' closing, he did exactly as he told Scott he would. He told the jury that one of three people could have had Scott's phone at the time of the carjacking: Hubbard, Evans, or McCloud. (*See* Jury Trial Tr. at 99-100, ECF #124 at Pg. ID 1875-76.) On rebuttal, the government told the jury that Soles had "just discredited" McCloud. (*See id.* at 102-03, Pg. ID 1878-79.)

**b**

Scott argues that Soles' decision to list McCloud as a possible possessor of the phone at the time of the carjacking was unreasonable and caused substantial prejudice. The Court disagrees on both points.

First, Soles' decision to suggest a possible link between McCloud and Scott's phone was a reasonable strategic choice. Soles reasonably determined that (1) it was essential for him to identify for the jury as many potential possessors of Scott's phone as possible in order to negate the force of the government's evidence that that phone was communicating with Hubbard's phone around the time of the carjacking; (2) it was plausible to suggest a link between McCloud, Scott's phone, and the carjacking given McCloud's incriminating statements on the recorded jail calls and her prior connections to Evans; and (3) because McCloud's testimony went so poorly, there was little, if anything, to lose by pointing the finger at McCloud. Soles' reasonable strategic choice to implicate McCloud did not fall below an objective standard of reasonableness.

Second, contrary to Scott's contention, Soles did not "destroy[]" Scott's alibi defense (or otherwise cause Scott cognizable prejudice) by implicating McCloud. (*See* Mot. for New Trial, ECF #144 at Pg. ID 2482.) As noted above, because McCloud's testimony went so poorly, she added very little to Scott's defense. Moreover, because McCloud went to bed well before the carjacking, she could not account for Scott's whereabouts at that critical time. And to the extent McCloud did place Scott at family movie night until she went to sleep, her alibi testimony was cumulative of that offered by Monico Hayes and Desmond Brooks. For these reasons, the Court rejects Scott's argument that Soles' decision to link McCloud to his phone caused him prejudice under the *Strickland* standard.

## 2

Scott next insists that Soles failed to investigate whether, and to establish that, Evans had a motive to testify falsely against Scott. (*See id.* at Pg. ID 2484.) More specifically, Scott contends that Soles failed to discover and present evidence from Paijah McCloud and Monico Hayes that Evans had threatened Scott (in text messages and phone calls) and harbored great anger toward Scott. (*See id.*) McCloud and Hayes described this evidence in affidavits that Scott submitted with his motion for new trial. (*See* Affidavit of Monico Hayes, ECF #144-1; Affidavit of Paijah McCloud, ECF #144-2.) The Court rejects this claim of ineffective assistance.

Soles and his team did not fail to investigate whether Evans had a motive to lie about Scott. As McCallister made clear, he attempted to follow-up on information provided by Scott that Evans had threatened Scott. (*See* March 12, 2018 Evid. Hearing Tr. at 67-69, ECF #344 at Pg. ID 4075-77.) Moreover, Soles was aware of much of the evidence described in the Hayes and McCloud affidavits. For instance, Soles was aware of threatening text messages that, according to Hayes and McCloud, were sent by Evans during the relevant time frame. But Soles determined that there were "evidentiary problems with getting them in." (*See* Nov. 7, 2017 Evid. Hearing Tr. at 169, ECF #261 at Pg. ID 3596.) The evidentiary problems included Scott's inability to lay an appropriate foundation for the admission of the text messages. The text messages that Scott provided to Soles had no dates on them and did not reveal the identity of their authors. (*See id.* 194-200, Pg. ID 3621-27.) Soles was also aware of photos showing damage to Scott's house that, according to McCloud and Hayes, was inflicted by Evans, but since no witness saw Evans damage the home, Soles saw no way to admit the photographs as evidence that Evans had an intent to harm Scott. (*See id.* at 200-01, Pg. ID 3627-28.)

Moreover, Soles made a reasonable strategic decision that the type of evidence identified in the McCloud and Hayes Affidavits would not be helpful to the defense. McCloud and Hayes claim that Evans threatened Scott because Evans was "extremely jealous of [Scott's relationship] with Roland Hubbard." (Hayes Aff. at

¶1, ECF #144-1 at Pg. ID 2492; McCloud Aff. at ¶1, ECF #144-2 at Pg. ID 2495.) Soles reasonably concluded that eliciting the fact that Evans threatened Scott out of jealousy "would have fit into the government's case." (Nov. 7, 2017 Evid. Hearing Tr. at 169-70, ECF #261 at Pg. ID 3596-97.) Part of that case, again, was the government's contention that Scott had inappropriately close relationships with vulnerable teenagers like Evans and Hubbard. Soles reasonably determined that he "didn't want to paint [a] picture" of "a young juvenile who was upset that he did not receive the same attention from [Scott] that Hubbard did." (*Id.*) Stated another way, Soles justifiably concluded that he did not want to paint Evans as "a guy that was crying for attention from [Scott]." (*Id.* at 170-71, Pg. ID 3597-98.)

For all of these reasons, the Court concludes that Scott has not shown that Soles was ineffective for failing to discover and/or present the evidence concerning Evans that is identified in the Hayes and McCloud Affidavits.[7]

---

[7] The Court rejects this particular claim of ineffective assistance for another, independent reason. It rests upon the affidavits of Hayes and McCloud, but Scott declined to call them as witnesses at the evidentiary hearing even though the Court expressly authorized him to do so. (*See* Nov. 7, 2017 Evid. Hearing Tr. at 24, ECF #261 at Pg. ID 3451; Order, ECF #196 at Pg. ID 3088.) The Court has serious concerns about the veracity of the testimony offered by Hayes and McCloud at trial and is unwilling to rely upon statements by them in their Affidavits that have not been subject to cross-examination.

Scott further argues that Soles was ineffective for failing "to investigate and discredit the government's contention that car parts from a 2006 Grand Marquis [like the one carjacked] can be utilized to replace the same parts on a 1996 Grand Marquis [like the one owned by Scott]." (*See* Mot. for New Trial, ECF #144 at Pg. ID 2469.) The government made that assertion to support its theory that Scott had a motive to carjack the 2006 Grand Marquis. Scott says that the defense missed a critical opportunity to destroy the government's theory of motive by showing that parts from the two vehicles are *not* interchangeable and, thus, that Scott would not have had a motive to carjack the 2006 Grand Marquis. Scott is not entitled to relief on this claim.

The defense team did investigate whether parts from a 2006 Grand Marquis could be used with the 1996 Grand Marquis model. As soon as Scott raised this issue with McCallister, McCallister personally went to Fred and Sons Auto Repair Shop and asked about whether the parts from the two models were interchangeable. (*See* Mar. 12, 2018 Evid. Hearing Tr. at 41-42, 99, ECF #344 at Pg. ID 4049-50, 4107.) The mechanics at Fred and Sons said that they believed that some of the parts on the 2006 Grand Marquis may have been interchangeable with the 1996 model, but they directed McCallister to Holbrook Auto Parts for a more authoritative

answer.[8] (*See id.*)  McCallister visited Holbrook Auto Parts the day after he met with Fred and Sons, and the staff at Holbrook confirmed that at least some of the parts from the 2006 Grand Marquis *could* be used on the 1996 model. (*See id.* at 41, Pg. ID 4049.)  McCallister's visits to two auto repair facilities constituted an objectively reasonable investigation into Scott's suggestion that parts from the 2006 Grand Marquis could not be used on the 1996 Grand Marquis.  Indeed, Scott had suggested that McCallister consult with the mechanics at Holbrook Auto Parts (*see* Nov. 7, 2017 Evid. Hearing Tr. at 68, ECF #261 at Pg. ID 3495), and thus Scott can hardly claim that McCallister was ineffective for conducting the precise investigation that Scott suggested.  In short, Scott has failed to show that the defense team's handling of the parts issue did not fall below an objective standard of reasonableness.[9]

Moreover, Scott has failed to show that he suffered prejudice from the defense team's handling of the parts interchangeability issue.  More specifically, he has not demonstrated a reasonable probability that if the defense team had presented evidence that parts from two vehicles were not interchangeable, that evidence would

_____

[8] Holbrook Auto Parts is a well-known, large-scale, and respected repair and parts facility in the City of Detroit. *See* http://holbrookautoparts.com/.

[9] At the evidentiary hearing before the Court, Soles testified that he did not have a specific memory of exactly what investigation McCallister did concerning the parts interchangeability issue or of precisely what McCallister reported with respect to that issue. (*See* Nov. 7, 2017 Evid. Hearing Tr. at 179, ECF #261 at Pg. ID 3606.) But Soles' current lack of recall does not change the fact that the defense team did investigate the parts interchangeability issue.

have meaningfully undermined the government's motive theory. Scott may be correct that evidence that the parts were not interchangeable could potentially have chipped away to some extent at the government's motive theory. But evidence of non-interchangeability would have had real force only if it had been accompanied by additional evidence that Scott, himself, knew or believed that the parts were not interchangeable. Indeed, if Scott did not know or believe that the parts were not interchangeable, then the actual lack of interchangeability would not have negated his motive to carjack the newer Grand Marquis. And Scott has not presented evidence that at the time of the carjacking he believed that the parts were not interchangeable. If anything, his testimony suggests that at the time of the carjacking he did *not* know whether the parts were interchangeable.[10] For these reasons, Scott has not shown a reasonable probability that evidence that parts from the two Grand Marquis vehicles were not interchangeable would have changed the result of the proceeding.[11]

---

[10] Scott testified that while he and the defense team were preparing his defense – long after the carjacking – he "asked" a mechanic whether parts from the two vehicles were interchangeable, and the mechanic "explained" to him that the parts were not interchangeable. (Nov. 7, 2017 Evid. Hearing Tr. at 68, ECF #261 at Pg. ID 3495.)

[11] In addition, it seems highly unlikely that the defense team could have presented evidence that no parts from the two vehicles could be interchanged. At the evidentiary hearing before the Court, a representative from a Ford-affiliated dealership testified that he conducted research into a Ford parts computer database, and he said that that research revealed that at least some parts – including one "major" part – from a 2006 Grand Marquis *could* be used on a 1996 Grand Marquis.

Finally, Scott argues that Soles was ineffective for failing to establish that Tynisha Jones "had damaged a 2005 Grand Marquis in a collision and needed to replace damaged body parts." (Mot. for New Trial, ECF #144 at Pg. ID 2469.) Scott suggests that this evidence would have established that Jones had a motive to carjack the 2006 Grand Marquis (or to have Evans do so at her behest). The Court rejects this claim of ineffective assistance.

Soles was not ineffective in failing to present the evidence of Jones' Grand Marquis because Scott never told the defense team about it prior to trial. Scott testified that he told Soles about this evidence by telephone shortly before trial (*see* Nov. 7, 2017 Evid. Hearing Tr. at 44-45, ECF #261 at Pg. ID 3471-72), but Soles and McCallister both denied that Scott mentioned this evidence. (*See id.* at 58-59, Pg. ID 3584-85; Mar. 12, 2018 Evid. Hearing Tr. at 42, ECF #344 at Pg. ID 4050.) The Court believes Soles and McCallister. The Court further concludes that Soles was not ineffective for failing to present evidence related to the Jones vehicle that Scott did not tell him or McCallister about.[12]

---

(Mar. 12, 2018 Evid. Hearing Tr. at 118-20, ECF #344 at Pg. ID 4126-28.) That testimony, which the Court finds credible, casts serious doubt on Scott's assertion – based upon his alleged conversation with a mechanic – that none of the parts are interchangeable.

[12] Scott argues that he has submitted a document that reflects that he gave Soles written notice of the Jones' vehicle issue prior to trial. (*See* Mar. 12, 2018 Evid. Hearing Tr. at 79-84, ECF #344 at Pg. ID 4087-92.) The Court rejects Scott's

## IV

Scott next contends that he is entitled to a new trial based upon newly-discovered evidence.  The evidence in question is sworn statements from two individuals – Tim Fulgenzi and Ryan Travis – who claim to have been incarcerated with Evans at the Dickerson detention facility after Evans testified against Scott in this case. (*See* Fulgenzi Statement, ECF #144-4 at Pg. ID 2502; Travis Statement, ECF #144-5 at Pg. ID 2504.)  Fulgenzi and Travis maintain that Evans recanted his trial testimony and confided in them that he lied when he told the jury in this case that Scott participated in the carjacking.  The Court concludes that Scott is not entitled to a new trial based upon the statements of Fulgenzi and Travis.

As an initial matter, Scott analyzes the evidence presented by Fulgenzi and Travis under the wrong framework.  Scott evaluates their statements under the test

---

reliance on this document to establish Soles' alleged knowledge of the issue.  Scott testified that he told Soles about the issue *orally by phone*. (*See* Nov. 7, 2017 Evid. Hearing Tr. at 44-45, ECF #261 at Pg. ID 3471-72.)  While under oath and subject to cross-examination, Scott never mentioned giving Soles *written* notice of the Jones' vehicle issue.  The Court rejects Scott's argument that he gave Soles written notice of the document because the argument is not consistent with his sworn testimony.  Moreover, while Scott was questioning Soles at the evidentiary hearing, Scott did not ask Soles about the document through which he (Scott) allegedly notified Soles about the issue. Scott thus deprived Soles (and the government) of an opportunity to rebut his claim that he gave Soles the document and that Soles read the document before trial.  Finally, the references to the 2005 Grand Marquis on the document in question are in tiny handwriting that is challenging to read.  Even if Scott gave this document to Soles before trial, it is far from clear that Soles would have recognized and sufficiently understood the references.

that the Sixth Circuit generally applies to claims of newly-discovered evidence. Scott accurately notes that under that test, a criminal defendant is not entitled to a new trial based upon newly-discovered evidence unless the defendant establishes that the evidence was:

> (1)     discovered only after trial;
>
> (2)     could not have been discovered earlier with due diligence;
>
> (3)     is material and not merely cumulative or impeaching; and
>
> (4)     would likely produce an acquittal if the case were retried.

(Mot for New Trial, ECF #144 at Pg. ID 2488, quoting *U.S. v. Willis*, 257 F.3d 636, 642 (6th Cir. 2001).

But the very Sixth Circuit decision that Scott quotes makes clear that this test does *not* apply where, as here, the newly-discovered evidence is the purported recantation of a government witness. *See Willis*, 257 F.3d at 642-43.  Instead, "a motion for a new trial based upon the recantation of a material government witness should be granted only if:

> (1)     the court is reasonably well satisfied that the trial testimony given by the material witness is false;
>
> (2)     without the false testimony, the jury might have reached a different conclusion; and

(3)     the party seeking the new trial was taken by surprise when the false testimony was given, and was unable to meet it or did not know of its falsity until after the trial.

*Id.* at 642-43 (quoting *Gordon v. United States*, 178 F.3d 896 (6th Cir. 1949)); *see also U.S. v. Bass*, 785 F.3d 1043, 1050 (6th Cir. 2015) (quoting *Willis*).[13]

The Court will not grant a new trial under this test because it is not "reasonably well satisfied" that Evans' trial testimony was false. This Court carefully observed Evans while he testified on both direct and cross-examination. While the defense undoubtedly landed some "blows" during cross-examination – by eliciting, among other things, Evans' very favorable plea deal, inconsistencies in Evans' versions of events, and Evans' prior criminal history – the core of Evans' testimony against Scott came across as entirely credible. Simply put, at the conclusion of Evans' testimony, the Court had no doubt but that he was telling the truth when he described Scott's role in the carjacking. The Court's assessment of Evans weighs heavily against granting a new trial based upon his purported recantation. *See id.* at 646 (explaining that the district judge who presided over a criminal defendant's trial is "'uniquely qualified' to address the defendant's motion for new trial based on [a government] witness's recantation").

---

[13] There is some question as to whether a defendant needs to satisfy the third element of this test as an absolute prerequisite to relief. *See Gordon*, 257 F.3d at 648. The Court need not grapple with that issue because the Court concludes that Scott cannot satisfy the first element of this test.

The statements by Fulgenzi and Travis that Evans recanted do not persuade the Court that Evans lied at trial. It is well-established in this Circuit that "affidavits by witnesses recanting their trial testimony are to be looked upon with extreme suspicion." *Id.* The declarations by Fulgenzi and Travis should be viewed with even more suspicion because they are one step removed from a direct sworn recantation by Evans; they are a report of a purported unsworn recantation by Evans. And the accounts of Evans' supposed recantation seem highly questionable.

Travis' account of Evans' alleged recantation does not make sense. According to Travis, Evans said that he (Evans) believed that his false trial testimony would "help" Scott. (Travis Statement, ECF #144-5 at Pg. ID 2504.) That is absurd. Evans testified that Scott was the ringleader of a carjacking. Evans could not possibly have believed that that testimony would have aided Scott.

Moreover, Travis' account of Evans' alleged recantation reveals that Evans had a strong motive to *falsely* recant. According to Travis, Evans wanted to ensure that "no one would think that he was a RAT." (*Id.*) Evans' self-reported desire not to be seen as a government cooperator gave Evans an incentive to describe his trial testimony to Travis as both false and an attempt to aid Scott. That incentive casts further doubt on the credibility of Evans' alleged recantation.

Fulgenzi's account of his interaction with Evans suffers from the same defects. Like Travis, Fulgenzi reports that Evans made the non-sensical claim that

43

he believed that his false testimony directly implicating Scott as the ringleader of the crime would "help" Scott. (Fulgenzi Statement, ECF #144-4 at Pg. ID 2502.) And the rest of Fulgenzi's statement is difficult, if not impossible, to understand. (*See id.*) Simply put, the sworn statements by Fulgenzi and Travis recounting Evans' alleged recantation do not cause the Court to doubt in any respect the truth of Evans' trial testimony. Accordingly, Scott is not entitled to a new trial based upon their statements.

## V

In connection with his claim that his attorneys provided ineffective assistance of counsel, Scott executed a limited waiver of his attorney-client privilege with his trial defense team. (*See* Aug. 8, 2017 Status Conf. Tr. at 42-43, ECF #224 at Pg. ID 3274-75; Order, ECF #196 at Pg. ID 3086-88.) The waiver covered only matters and issues related to the claims of ineffectiveness that Scott had raised. (*See* Order, ECF #196 at Pg. ID 3086-88.) Scott now complains that Soles and McCallister revealed privileged communications beyond the scope of the waiver. The Court is not persuaded that either Soles or McCallister revealed any material privileged communications beyond the scope of the limited waiver. Moreover, the government has not relied upon any privileged communications outside the scope of the waiver in opposing Scott's motion for new trial, nor has Scott shown that the government has made any use whatsoever of such communications. Furthermore, the Court has

not considered, and does not rely on, any privileged communications in this order denying Scott's motion for new trial. Accordingly, Scott has not shown that any alleged revelation of attorney-client communications entitles him to a new trial or to any relief in these proceedings.

## VI

While Scott's motion for new trial has been pending, Scott has filed myriad motions, letters, affidavits, and notices with the Court – over 150 in total – seeking various forms of relief and lodging numerous complaints against, among others, the Court, the government, the court reporters, his assigned counsel, and his assigned standby counsel. The Court **DENIES** all of Scott's miscellaneous pending requests for relief because Scott has not persuaded the Court that he is entitled to any of the relief that he seeks.[14]

---

[14] As noted above, the Court denies all of Scott's pending requests for relief whether the requests were presented in a motion, letter, or otherwise. For docket clarity, the Court notes that its denial of relief includes, but is not limited to, the denial of the following submissions that Scott labeled as "motions": ECF ## 177, 187, 193, 199-200, 213, 217-18, 220-22, 230, 241-43, 246-49, 251-52, 254, 257-58, 262, 265, 267-69, 271, 273-74, 289, 309, 314-15, 323, 330, 332-34, 336, 338, 349-350, 355, 357, 365, 370-71, and 379.

## VII

For the reasons stated above, Scott's motion for a new trial (ECF ## 144, 162)

and all of his other miscellaneous requests for relief are **DENIED**.

**IT IS SO ORDERED.**

/s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  May 10, 2018


I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on May 10, 2018, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(810) 341-9764